NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KRISTINA VERCELLONO and DANIEL VERCELLONO, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> GERBER PRODUCTS COMPANY; HELENE CURTIS, INC.; JOHNSON & JOHNSON CONSUMER COMPANIES, INC.; MZB PERSONAL CARE; M.Z. BERGER & COMPANY; NESTLE U.S.A., INC.; THE PROCTOR & GAMBLE DISTRIBUTING LLC and WAL-MART STORES, INC., <br><br> Defendants. | **Hon. Dennis M. Cavanaugh** <br><br> **OPINION** <br><br> Civil Action No. 09-CV-2350 (DMC) |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion[1] by Johnson & Johnson Consumer Companies, Inc. ("J&J"), Wal-Mart Stores, Inc. ("Wal-Mart"), Gerber Products Company ("Gerber"), Proctor & Gamble Distributing LLC ("P&G"), MZB Personal Care ("MZB") and MZ Berger & Company ("MZ") (collectively "Defendants") to dismiss the complaint of Kristina Vercellono and Daniel Vercellono, individually and on behalf of all others similarly situated, ("Plaintiffs") for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and for lack of subject

---

[1] This case is inherently intertwined with the disposition reached in another case pending before this Court, Levinson v. Johnson & Johnson Consumer Companies, Inc., Civ. Act. No. 09-cv-3317. Therefore, the Court incorporates and relies upon that disposition in forming an ultimate determination in this matter.

matter jurisdiction pursuant to Fed. R. Civ. 12(b)(1).[2] Pursuant to Fed. R. Civ. P. 78, no oral argument was heard. After considering the submissions of all parties, it is the decision of this Court for the reasons herein expressed that Defendants' motion to dismiss is **granted in part** and **denied in part**.

**I    BACKGROUND**

The Amended Class Action Complaint is brought individually and behalf of all class purchasers ("Class Members") Defendants. Plaintiffs allege that the contaminated products include J&J's Baby Shampoo (J&J product), Wal-Mart's Equate Tearless Baby Wash (Wal-Mart product), Grins & Giggles Milk & Honey Baby Wash (Gerber/Nestle product), Suave Kids 2-in-1 Shampoo (Helene Curtis product), Dora the Explorer Bubble Bath (MZB product) and Pampers Kandoo Foaming Handsoap (P&G product). (Plaintiffs' Complaint ("Pl. Compl."), ¶ 1). Plaintiffs allege that "[a]lthough Defendants represented that the products they marketed, distributed, promoted, sold, and/or made were safe for children, the Children's Personal Care Products were actually contaminated with toxic chemicals linked to increased cancer risk, adverse skin reactions, and other serious health problems." (Pl. Compl., ¶ 2). Plaintiffs allege that these products consist of toxic and potentially cancer-causing chemicals including, formaldehyde, 1,4-dioxane and methylene chloride a chemical banned for use in cosmetics by the Food and Drug Administration ("FDA"). (Pl. Compl., ¶ 2-3). Further, Plaintiffs allege that none of the named Defendants disclosed the incorporation of

---

[2] Moving Defendants, Wal-Mart, Gerber, P&G, MZ and MZB, adopt and incorporate by reference the arguments put forth in the brief by J&J for purposes of the motions discussed herein. Therefore, while all materials were subject to this Court's review, reference to Defendants' brief means the J&J brief. Similarly, while all of Plaintiffs' opposition briefs have been considered and reviewed, for purposes of reference in this opinion, the Court is referring to Plaintiffs' brief in docket entry number 64.

these chemicals in their products and simultaneously, marketed their products as safe.

"Independent Lab Tests of several samples of Johnson's Baby Shampoo revealed methylene chloride levels between 0.35 ppm and 1.1 ppm, 1,4-dioxane levels between 20 ppm and 38 ppm, and formaldehyde levels between 150 ppm and 230 ppm." (Pl. Compl., ¶ 9). "Independent Lab Tests of Grins & Giggles Milk & Honey Baby Wash revealed 1,4-dioxane levels of 9.5 ppm and formaldehyde levels of 340 ppm." (Pl. Compl., ¶ 11). "Independent Lab Tests of Equate Tearless Baby Wash revealed methylene chloride levels of 0.57 ppm, 1,4-dioxane levels of 39 ppm and formaldehyde levels of 360 ppm." (Pl. Compl., ¶ 12). "Independent Lab Tests of Dora the Explorer Bubble Bath revealed 1,4-dioxane levels of 4.4 ppm and formaldehyde levels of 120 ppm." (Pl. Compl., ¶ 13).  "Independent Lab Tests of Pampers Kandoo Foaming Handsoap revealed formaldehyde levels of 180 ppm." (Pl. Compl., ¶ 14).

Plaintiffs allege that the offensive chemicals could have been removed or at least reduced by a process called "vacuum stripping." (Pl. Compl., ¶ 18). Further, despite the presence of these chemicals, Defendants' products contain descriptive messages such as, "Gentle & Mild," "Ultra Mild" and "Hypoallergenic" and "rinses clean . . . gentle enough even for newborns." (Pl. Compl., ¶ 17).

Count I of Plaintiffs' complaint asserts a claim for breach of implied warranty Uniform Commercial Code("UCC") §2-314. (Pl. Compl., ¶ 98). Count II of Plaintiffs' complaint asserts a claim for breach of implied warranty of merchantability and breach of implied warranty of fitness for a particular use. (Pl. Compl., ¶ 110). Count III of Plaintiffs' complaint asserts a claim for violation of various unfair and deceptive trade practices acts. (Pl. Compl., ¶ 117). Count IV of

Plaintiffs' complaint asserts a claim for unjust enrichment. (Pl. Compl., ¶ 125).

**II.    STANDARD OF REVIEW**

"There is a fundamental difference of review under Rule 12(b)(1), where the existence of disputed facts will not preclude the court from evaluating the merits of the jurisdictional claim, and Rule 12(b)(6) where the court is required to accept as true all the allegations of the complaint and all inferences arising from them." Anjelino v. New York, 200 F.3d 73, 87 (3d Cir. 1999). "[T]he threshold to withstand a motion to dismiss under [Rule] 12(b)(1) is thus lower than that required to withstand a Rule 12(b)(6) motion." Kehr Packages Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)).

A.    Fed. R. Civ. P. 12(b)(6)

"The [d]istrict [c]ourt, in deciding a motion under Fed. R. Civ. P. 12(b)(6), [is] required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [Plaintiff]." Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [ ] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). "Factual allegations must be enough to raise a right to relief above a speculative level, [ ] on the assumption that all factual allegations in the complaint are true (even if doubtful in fact)." Bell, 550 U.S. at 555-56.

B.     Fed. R. Civ. P. 12(b)(1)

"On a Rule 12(b)(1) motion, no presumption of truthfulness attaches to the allegations of the plaintiff." CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008). A facial attack "concerns 'an alleged pleading deficiency' whereas a factual attack concerns the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." Id. (citing U.S. ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007)).

**III.    DISCUSSION**

A.     Standing

To bring a suit in a federal court, the plaintiff must have standing pursuant to Article III of the United States Constitution. To establish standing under Article III, the plaintiff must show: (1) injury in fact; (2) causation; and (3) redressability. Horvath v. Keystone Health Plan E., Inc., 333 F.3d 450, 455 (3d Cir. 2003); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

> First, the plaintiff must have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. (citing AT&T Communications of N.J., Inc.v. Verizon N.J., Inc., 270 F.3d 162, 170 (3d Cir. 2001)). "The injury must affect the plaintiff in a personal and individual way." Pitt News v. Fisher, 215 F.3d 354 (3d Cir. 2000); Alston v. Countrywide Fin. Corp., 585 F.3d 753, 763 (3d Cir. 2009).

"[O]rdinarily, one may not claim standing .... to vindicate the constitutional rights of some

5

third party." Pitt, 215 at 362. "We apply this prudential rule against third party standing even when the requirements of Article III have been met, to 'avoid deciding questions of broad social import . . . [and] to limit access to the federal courts to those litigants best suited to assert a particular claim.'" Id. (citing Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99-100 (1979)). "[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." Berg v. Obama, 586 F.3d 234, 239 (2009) (citing Warth v. Seldin, 422 U.S. 490, 499 (1975)). Furthermore, "[t]he standing inquiry does not change in the context of a putative class action….[S]tanding cannot be predicated on an injury which the plaintiff has not suffered, nor can it be acquired through the back door of a class action." Koronthaly v. L'Oreal, 2008 U.S. Dist. LEXIS 59024, *12 (D.N.J. July 25, 2008).

    As a threshold matter, Defendants contend that Plaintiffs lack standing to sue in the instant action given that Plaintiffs failed to allege any "manifest, present, non-speculative" injury-in-fact or that the product failed to perform the hair-cleansing benefits for which it was sold. (D. Br. at 11). Moreover, in reliance upon this Court's decision in Koronthaly, Defendants assert that Plaintiffs' demand for a refund of the purchase price as a consequence of exposure to Defendants' products fails to establish an injury-in-fact and therefore, is not sufficient to confer standing where the alleged harm is no more than hypothetical. As a result, Defendants claim that the absence of a cognizable injury and thereby standing in this matter requires dismissal pursuant to Fed. R. Civ. P. 12(b)(1).

    In response, Plaintiffs contend that economic injury is sufficient to confer standing in this matter, relying upon Clinton v. City of New York, 524 U.S. 417 (1998) and Danvers Motor Co. v. Ford Motor Co., 432 F.3d 286 (3d Cir. 2005). Plaintiffs contend that where the product contains

6

undisclosed toxins and an ingredient banned by the FDA, the injury arises at the time of purchase. In distinguishing the Koronthaly v. L'Oreal case, citing to this Court's disposition on a motion for reconsideration, Plaintiffs assert that unlike Koronthaly where this Court determined that plaintiff "provided no authoritative evidence that the lead levels in defendants' lipstick products constitute[d] a dangerous amount or [were] in some way prohibited[,]" the present action involves methylene chloride, a substance banned by the FDA for use in cosmetics. 2008 U.S. Dist. LEXIS 86419, *11 (D.N.J. Oct. 24, 2008). Further, Plaintiffs contend that the Environment Protection Agency ("EPA") classifies the other chemicals at issue as probable carcinogens.  Lastly, Plaintiffs assert that their claims should stand because Plaintiffs have at least raised an issue of fact with respect to whether the chemicals contained in Defendants' products are dangerous in amount.

      The Koronthaly case involved the purchase of a lipstick containing lead, the content of which was not subject to FDA regulation. Id. at *2-3.  However, the lead content of the lipstick appeared dangerous when compared to the lead content regulation imposed by the FDA on candy. Id.  In the absence of an FDA regulation concerning lead content in lipstick, or other legal prohibition, the plaintiff could not "seek a remedy for a harm that she ha[d] not actually or allegedly suffered." Moreover, this Court accorded great weight to the decision in Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171 (D.D.C. 2003), concluding that the "plaintiffs' allegation of an economic injury in a products liability action was insufficient to establish injury-in-fact" because "without alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs." Id. at *13-14.  Therefore, the Williams Court "remarked that benefit of the bargain injury could not sustain a claim of injury in fact." Id.

"The term 'cosmetic' means (1) articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance, and (2) articles intended for use as a component of any such articles; except that such term shall not include soap." 21 U.S.C. § 321(i). "In its definition of the term 'cosmetic,' the Federal Food, Drug, and Cosmetic Act specifically excludes soap. The term 'soap' is nowhere defined in the act. In administering the act, the Food and Drug Administration interprets the term 'soap' to apply only to articles that meet the following conditions:"

> (1) The bulk of the nonvolatile matter in the product consists of an alkali salt of fatty acids and the detergent properties of the article are due to the alkali-fatty acid compounds; and
>
> (2) The product is labeled, sold, and represented only as soap.

21 § C.F.R. 701.20. With the exception of the P&G product, represented as a hand soap, the remaining products appear to qualify as cosmetics subject to the FDA regulation banning the use of methylene chloride.

While the Court agrees that the assertion of an economic injury is not an automatic bar to standing, Koronthaly demonstrates that an exception has been recognized in the context of claims concerning defective products, absent a specific legal prohibition precluding particular ingredients or usages. Insofar as Plaintiffs claims pertain to allegedly toxic chemicals that have not been banned by the FDA for use in cosmetics, including 1,4-dioxane and formaldehyde, in accordance with Koronthaly, this Court concludes that any potential injury is too remote, hypothetical and/or conjectural to establish standing in this matter. However, insofar as Plaintiffs claims pertain to

8

methylene chloride, a chemical explicitly banned for use by the FDA in any cosmetic, this Court declines to dismiss Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(1) for lack of standing. Therefore, at this time, Plaintiffs' complaint may only proceed with respect to Defendants, J&J and Wal-Mart only.

    B.    Choice of Law

As a federal district court sitting in diversity, this Court must apply the choice of law rules of New Jersey, the forum state. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). New Jersey's choice of law rules mandate that the determinative law is that of the state with the greatest interest in governing the particular issue. The first step is to determine whether a conflict exists between the law of interested states, and then any conflict shall be determined on an issue-by-issue basis. "Under general conflict of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a "false conflict," and the Court should avoid the choice-of-law question." Williams v. Stone, 109 F.3d 890, 894 (3d Cir. 1997). If there is a conflict, then the Court must identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation. If the state's law is not related to its contacts with the litigation, then the state does not have an interest in having its law applied to the underlying issue. See Vezey v. Doremus, 510 A.2d 1187, 1189 (N.J.1986). That is, if there is an actual conflict between the two states' laws, the court then determines "which state has the most meaningful connections with and interests in the transaction and the parties." Spence-Parker v. Del. Riv. & Bay Authority, 2009 U.S. Dist. LEXIS 75187, *20 (D.N.J. Aug. 21, 2009). Where no actual conflict of law exists, no choice of law need be made. See Zavala v. Wal-Mart

Stores, Inc., 393 F. Supp. 2d 295, 333 (D.N.J. 2005). "If there is no actual conflict, the Court must apply the law of New Jersey." LNT Merck Co. v. Dyson, Inc., 2009 U.S. Dist. LEXIS 62308, *6 (D.N.J. July 21, 2009) (citing Lebegern v. Forman, 471 F.3d 424, 428 (3d Cir. 2006)). In that instance, a motion to dismiss under Fed. R. Civ. P. 2(b)(6) should be decided under New Jersey law. See Gallerstein v. Berkshire Life Ins. Co. of America, 2006 U.S. Dist. LEXIS 64487, *3 (D.N.J. Sept. 11, 2006).

The parties' respective moving papers recognize that the outcome is the same regardless of whether New Jersey State Law or Nevada State Law is applied to this diversity action. Therefore, the parties assert that no conflict of laws issue is present in the instant matter.

  C. New Jersey State Law Breach of Warranty, Consumer Fraud and Unjust Enrichment Claims

Defendants assert that dismissal is required with respect to all Plaintiffs' claims because the claims are based on alleged harm caused by a product and as a consequence, are subsumed by the New Jersey Product Liability Act ("PLA"). (D. Br. at 18). Plaintiffs contend that the PLA does not apply because their claims are essentially classic breach of warranty and consumer fraud causes of action. Plaintiffs argue that "[w]hile the PLA covers and subsumes causes of action involving physical harms caused by a product, the [Consumer Fraud Act ("CFA")] and other remedies remain available when the plaintiffs only claim economic injuries involving a product." (Pl. Br. at 17). Further, Plaintiffs argue that the PLA does not apply because Plaintiffs do not assert themselves as "claimants" or allege "harm" as defined by the PLA. (Pl. Br. at 19).

The New Jersey Supreme Court decision in Sinclair v. Merck & Co. is instructive. In

Sinclair v. Merck & Co., the Plaintiffs "alleged that as a result of their direct and prolonged consumption of Vioxx, they are at enhanced risk of serious undiagnosed and unrecognized myocardial infarction, commonly referred to as "silent heart attack," and other latent and unrecognized injuries." 195 N.J. 51, 55 (2008).  In that case, the plaintiffs asserted claims for negligence, violation of the Product Liability Act, violation of the Consumer Fraud Act, breach of express and implied warranties and unjust enrichment.  Id.  In dismissing the complaint in its entirety, New Jersey Supreme Court determined the following,

> [p]laintiffs seek to avoid the requirements of the PLA by asserting their claims as CFA claims.  However, the Legislature expressly provided in the PLA that claims for "harm caused by a product" are governed by the PLA "irrespective of the theory underlying the claim."  N.J.S.A. 2A:58C-1b(3). We explained in Lead Paint, supra, that "[t]he language chosen by the Legislature in enacting the PLA is both expansive and inclusive, encompassing virtually all possible causes of action in relating to harms caused by consumer and other products." 191 N.J. at 436-37.  As a result, we declared that "[i]n light of the clear intention of our Legislature to include all [product liability] claims within the scope of the PLA, we find no ground on which to conclude that the claims being raised by plaintiffs, regarding an ordinary household product used by consumers, were excluded from the scope of" the PLA.  We reach the same conclusion here.
>
> The language of the PLA represents a clear legislative intent that, despite the broad reach we give to the CFA, the PLA is paramount when the underlying claim is one for harm caused by a product. The heart of plaintiffs' case is the potential for harm caused by Merck's drug. It is obviously a product liability claim. Plaintiffs' CFA claim does not fall within an exception to the PLA, but rather clearly falls within its scope. Consequently, plaintiffs may not maintain a CFA claim.

Id.³ ⁴

Similarly, at the heart of this matter is the potential for harm caused by the defective products, J&J Baby Shampoo and Wal-Mart Equate Tearless Baby Wash, containing allegedly "toxic chemicals linked to increased cancer risk, adverse skin reactions, and other serious health problems." (See Pl. Compl., ¶ 2). Plaintiffs directly assert that they "were damaged by Defendants' omissions and failure to warn that their Children's Personal Care Products were contaminated with toxic and potentially cancer-causing chemicals." (Pl. Compl., ¶ 4). Therefore, consistent with the Sinclair decision, this Court concludes that the PLA subsumes all of Plaintiffs' claims, effectively precluding Plaintiffs' claims with respect to the CFA, and otherwise, in the absence of "harm" as defined by the PLA. The Court does not agree that articulating a claim in terms of pure economic harm where the core issue is the potential injury arising as a consequence of the products' allegedly harmful chemicals converts the underlying defective product claim into an independent and unrelated consumer fraud issue. Limiting a claim to economic injury and the remedy sought to economic loss cannot be used to obviate the PLA.

The assertion of a claim pursuant to the PLA is premised upon a requisite level of harm, including:

---

3

Although this Court permitted the CFA claims to proceed in Nafar v. Hollywood Tanning Sys., Inc., in that case, the Plaintiff's claims and basis for distinction of the CFA from the PLA was the purchase of services, rather than the purchase of a defective product. 2007 U.S. Dist. LEXIS 26312, *12-14 (D.N.J. Apr. 5, 2007). CFA claims rooted in services are clearly distinguishable from claims grounded in products. The present action does not involve a claim for defective services.

4

Further, Plaintiffs misconstrue In re Ford Motor Co. E-350 Van Products, 2008 U.S. Dist. LEXIS 73690, *48 n.9 (D.N.J. Sept. 3, 2008), where the Court did indeed find the Sinclair case "inapposite" "because, by design, the PLA 'except[s] actions for harm caused by breach of an express warranty[,]' which plaintiffs expressly allege[d.]" On the basis of an express warranty, the Court concluded that Sinclair decision "does not mandate dismissal of unjust enrichment and state consumer fraud claims where a party does not plead a PLA claim." Id.(internal citations omitted). Plaintiffs do not assert a claim for breach of an express warranty in the present action.

> (a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph.

N.J.S.A. 2A:58C-1b(2). Harm, for purposes of the PLA, does not include pure economic loss. Insofar as Plaintiffs concede that their injury is purely economic, Plaintiffs' claims cannot survive. Therefore, with respect to New Jersey law, in accordance with Sinclair, Plaintiffs' complaint is dismissed without prejudice in its entirety.

    D.    Nevada State Law Breach of Warranty, Consumer Fraud and Unjust Enrichment Claims

Despite the parties' respective beliefs that there is no conflict of law issue present in the instant matter, it is not clear to the Court that product liability laws of Nevada subsume related claims in the same manner as the New Jersey PLA. Therefore, upon dismissal of all New Jersey State Law claims and for purposes of inclusion, the Court will proceed by addressing the viability of Plaintiffs' claims under Nevada State Law. If Plaintiffs have asserted viable claims pursuant to Nevada State Law, then a conflict of law exists and the Court will undertake to ascertain which state has the superior interest in the litigation.

    i.    Consumer Fraud

Defendants argue that Plaintiffs consumer fraud claims must fail under Nevada Deceptive Trade Practices Act ("DTPA") because Plaintiffs do not allege any non-speculative damages recoverable under the Act and do not qualify as "victims" pursuant to the DTPA. (D. Br. at 23). Further, Defendants assert that Plaintiffs' allegations concerning Defendants' products and purported

13

misconduct fail to comport with the specificity requirement imposed by Fed. R. Civ. P. 9(b) in the context of alleged fraud. (D. Br. at 27). Plaintiffs assert that pursuant to Nevada State Law, Plaintiffs qualify as victims where economic harm is incurred as a consequence of Defendants' misrepresentations or deceptive practices. (Pl. Br. at 15). Further, Plaintiffs assert that the complaint is in compliance with the heightened pleading standard established under Fed. R. Civ. P. 9(b), given Plaintiffs' allegations identify specific misrepresentations and omissions, the location of the acts in question and the particularity of the Class Period in which the allegedly harmful products were purchased. (Pl. Br. at 16).

"A person engages in a "deceptive trade practice" if, in the course of his business or occupation, he: [k]nowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith." Nev. Stat. Ann. § 598.0915. "A person engages in a "deceptive trade practice" when in the course of his business or occupation he knowingly: [v]iolates a state or federal statute or regulation relating to the sale or lease of goods or services." Nev. Stat. Ann. § 598.0923. Nev. Stat. Ann. § 41.600 creates a private right of action for a "victim" of a deceptive trade practice pursuant to Nev. Stat. Ann. § 598.0915-598.025, inclusive. Although no official definition of "victim" has been asserted by the Nevada Supreme Court to date, at least one Nevada district court has interpreted the term "victim" as requiring the experience of some 'harm or loss' or damage as a result of an offender's actions. <u>Weaver v. Aetna Life Ins. Co.</u>, 2008 U.S. Dist. LEXIS 93658, *15 (D. Nev. Nov. 4, 2008). If a claimant prevails, the law entitles that claimant to the damages sustained, costs in the action and reasonable attorney's fees. Nev. Stat. Ann.

§ 41.600. Plaintiffs allege and Defendants do not appear to dispute that the FDA prohibits the use of methylene chloride in cosmetics. Therefore, in accordance with the foregoing limitations, with respect to allegations concerning the use of methylene chloride in these products, the Court declines to dismiss Plaintiffs' complaint pursuant the Nevada Deceptive Trade Practices Act.

Although foreclosed by application of the PLA in the instant case, the CFA was enacted to "protect the consumer against imposition and loss as a result of fraud and fraudulent practices by persons engaged in the sale of goods and services." Smith v. Alza, 400 N.J. Super. 529, 552 (2008). By way of inference, the intent of the foregoing Nevada legislation appears to be analogous to the New Jersey CFA in that it seeks to protect consumers from fraud. The representative Plaintiffs in this action reside in Nevada and presumably, the purchases of the allegedly defective products occurred in Nevada. The remaining Defendants include J&J, a New Jersey corporation doing business throughout the United States, and Wal-Mart, an Arkansas corporation doing business throughout the United States. Therefore, the Nevada State Law prevails with respect to this issue.

### ii. Breach of Implied Warranty

Defendants contend that Plaintiffs' complaint fails to assert that the allegedly defective products failed to perform the cleansing function for which they were sold or assert that the product was unfit for either its ordinary use or a particular purpose. (D. Br. at 28-29). Plaintiffs assert that they have adequately alleged that the products are unfit for both their ordinary use because they have been adulterated with methylene chloride and unfit for their particular use on children. (Pl. Br. 35-37).

"Goods to be merchantable must be at least such as[:]"

(a) Pass without objection in the trade under the contract description; and

  (b) In the case of fungible goods, are of fair average quality within the description; and

  (c) Are fit for the ordinary purposes for which such goods are used; and

  (d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

  (e) Are adequately contained, packaged and labeled as the agreement may require; and

  (f) Conform to the promises or affirmations of fact made on the container or label if any.

Nev. Stat. Ann. § 104.2314. The UCC provides that unless excluded or modified, there is an implied warranty that a good is merchantable and suitable for the particular purpose for which it is sold. Vacation Village v. Hitachi Am., 110 Nev. 481, 485 (1994), r'hrg denied, 111 Nev. 1218 (1995). "Where the seller at the time of contracting had reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified . . . an implied warranty that the goods shall be fit for such purpose." Mohasco Indus. v. Anderson Halverson Corp., 90 Nev. 114, 119 (1974).

  Although foreclosed by application of the PLA in the instant matter, the underlying purpose of the UCC as recognized by the New Jersey Supreme Court, is "to simplify, clarify and modernize the law governing commercial transactions; to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and to make uniform the law among various jurisdictions." N.J.S.A. 12A:1-102(1); Alloway v. General Marine Indus., L.P., 149 N.J. 620, 630 (1997). Pursuant the UCC as adopted by Nevada Legislature, the State's provisions are in accordance with the foregoing underlying purposes. Nev. Rev. Stat. § 104.1103. Thus, for the same reasons

16

identified in the preceding section, the contacts associated with Nevada State favor application of Nevada law over New Jersey with respect to this issue.

    iii.  Unjust Enrichment

Defendants move to dismiss Plaintiffs' unjust enrichment claim for failure to plead in the alternative, for failure to identify wrongful conduct on behalf of Defendants and given the existence of an adequate remedy at law for the harm alleged. (D. Br. at 30-31). Plaintiffs assert that pleading in the alternative is not require and further, they adequately alleged a claim for unjust enrichment pursuant to Nevada State Law, having paid for products that were useless and the Defendants having retained Plaintiffs' money. (Pl. Br. 38-39).

Equitable relief is premised upon the unavailability of an adequate legal remedy. Las Vegas Fetish & Fantasy Halloween Ball, Inc. v. Ahern Rentals, 182 P.3d 764, 767 n.14 (2008); Dairy Queen, Inc. v. Wood, 369 U.S. 469 (1962). A claim for unjust enrichment seeks to invoke an equitable remedy such as restitution, an accounting, and/or a constructive trust. See MacDonald v. Krause, 77 Nev. 312, 318 (1961). "Unjust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another." Mainor v. Nauft, 120 Nev. 750, 763 (2004). "Equity does not favor a person being unjustly enriched." Id. "This court has observed that the essential elements of unjust enrichment 'are a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit.'" Topaz Mut. Co. v. Marsh, 208 Nev. 845, 856 (1992) (citing Unionamerica Mtg. v. McDonald, 97 Nev. 210, 212 (1981)). "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good

17

conscience." Nevada Indus. Dev. v. Benedetti, 103 Nev. 360, 367 n.2 (1987).

Notably, equitable relief is precluded where an adequate legal remedy exists. See Las Vegas Fetish, 182 P.3d at 767 n.14. "Nevada's recognition of the rule disallowing recovery of equitable remedies where a plaintiff has a full and adequate remedy at law has no bearing on a plaintiff's right to plead in the alternative and to present evidence in support of all his well-pleaded claims for relief." George v. Morton, 2007 U.S. Dist. LEXIS 15932, *28 (D. Nev. 2007). Nonetheless, in the instant matter, Plaintiffs exclusively assert pure economic harm. Therefore, the Court concludes that a claim for damages affords Plaintiffs an adequate remedy if Plaintiffs prevail. A false conflict arises concerning the claim for unjust enrichment, therefore, the Court will not conduct a conflict of law analysis on this issue. Plaintiffs' claim for unjust enrichment in the instant matter is dismissed pursuant to Nevada State Law.

**IV.** **CONCLUSION**

For the foregoing reasons, Defendants' motion is **granted in part** and **denied in part**. Plaintiff's complaint is **partially dismissed without prejudice** pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). An appropriate order accompanies this opinion.

|  |  |  |
|---|---|---|
|  |  | S/ Dennis M. Cavanaugh |
| Dated: | February  3 , 2010 | Dennis M. Cavanaugh, U.S.D.J. |
| cc: | All Counsel of Record |  |
|  | Hon. Mark Falk, U.S.M.J. |  |
|  | File |  |